# JONATHON ZIMMER SCHUCH, M.Eng., P.E.

**ADDRESS:**  849 Locust Avenue
Charlottesville, Virginia 22902
(434) 989-2065

**EDUCATION:**

Master of Engineering, Biomedical Engineering, University of Virginia, Charlottesville, Virginia, 1984. Awarded scholarship for academic excellence covering tuition, fees and stipend.

Bachelor of Science, Biological Sciences, North Carolina State University, Raleigh, North Carolina, 1981. Graduated with honors.

**EMPLOYMENT:**

July, 2012 – March, 2021
    Director of Occupational Health and Wellness
    University of Virginia Health System, Charlottesville, Virginia

Responsible for merging Employee Health, the Employee Same Day Clinic, and UVA-WorkMed into one business unit within the Health System. Assess business operations and pursue strategies to improve quality, customer satisfaction, and efficiency. Implement programs to improve employee safety and to meet CMS, OSHA, and Accreditation Organization regulations and standards. Take action to expand UVA's market share in employee wellness and occupational health services. Continue to manage and oversee the delivery of rehabilitation engineering services.

September, 2007 – July, 2012
    Director, Rehabilitative Services and UVA-WorkMed
    University of Virginia Health System, Charlottesville, Virginia

Responsible for the strategic planning, program development, and operational management of the Occupational Therapy, Physical Therapy, Speech Language Pathology, Rehabilitation Engineering, and UVA-WorkMed programs within the Health System. Develop and oversee budgets that exceed $6 million dollars. Oversee programs that employ more than 80 employees. Oversee clinical research and grant funded activities performed by rehabilitation, occupational-medicine, and health/wellness clinicians.

November, 2004 – September, 2007
    Manager, UVA-WorkMed and Rehabilitation Engineering Services
    University of Virginia Health System, University of Virginia, Charlottesville, Virginia.

Responsible for the management and development of a comprehensive occupational health and medicine program at the University of Virginia. Develop and oversee an annual budget that approaches $700,000 per year. Manage clinical and non-clinical personnel. Develop and implement service contracts with businesses located throughout Central Virginia. Coordinate services between collaborating clinical entities located within the University of Virginia Health System. Oversee program improvement and expansion activities. Continue to manage the Rehabilitation Engineering Services Program.

Updated: 2/25//22

December, 1989 – November, 2004
    Manager, Rehabilitation Engineering Services
    University of Virginia Health System, University of Virginia, Charlottesville, Virginia.

Responsible for the establishment, management and ongoing development of a free-standing rehabilitation engineering program within the University of Virginia Health System. Manage the clinical, educational, and research activities of the program. Write and manage grants; develop and fulfill service contracts; collaborate with other academic departments, governmental agencies, and industry on special projects. Teach graduate and undergraduate engineers, medical residents, allied health students, and healthcare professionals.

June, 1985 - December, 1989
    Rehabilitation Engineer, Department of Orthopaedics and Rehabilitation
    School of Medicine, University of Virginia, Charlottesville, Virginia.

Established a nationally recognized wheelchair seating program within the Division of Prosthetics and Orthotics. Developed and implemented strategies to maximize the program's clinical effectiveness and financial strength. Provided clinical education and supervision to graduate biomedical engineers enrolled in the University's federally-funded Rehabilitation Engineering Training Program. Participated in the clinical evaluation and refinement of new products developed by the University of Virginia's Rehabilitation Engineering Center on Wheeled Mobility.

June, 1983 – June, 1985
    Director, Rehabilitation Engineering Services
    Woodrow Wilson Rehabilitation Center, Fishersville, Virginia.

One of only two service-oriented rehabilitation engineers employed at that time by the Commonwealth of Virginia. Coordinated, both administratively and clinically, in-house and field rehabilitation engineering consultation, design and fabrication services. As an applied biomedical engineer, implemented, utilizing human factors design, assistive devices and equipment that maximized individuals' employability, physical independence, and quality of life. Managed an allied medical department and professional service in a manner that complied with both rehabilitation and hospital association standards.

**ACADEMIC APPOINTMENTS**

| | |
|---|---|
| 2002-2021 | Assistant Professor of Medical Education, Department of Physical Medicine and Rehabilitation, School of Medicine, University of Virginia |
| 1992-2000 | Assistant Professor of Medical Education, Department of Physical Medicine and Rehabilitation, School of Medicine, University of Virginia |
| 1989-1992 | Instructor, Department of Physical Medicine and Rehabilitation, School of Medicine, University of Virginia |
| 1985-1989 | Instructor, Department of Orthopaedics and Rehabilitation, School of Medicine, University of Virginia |

## SELECT PROFESSIONAL ACHIEVEMENTS

| | |
|---|---|
| 2020 | Significant contributor to the University of Virginia's response to COVID-19 to minimize the spread of infection among faculty, staff, students and patients. Implemented procedures for managing and testing symptomatic employees, evaluating employee exposures, addressing confirmed positive employees, and vaccinating 15,000 employees with Pfizer and Moderna vaccine under Emergency Use Authorization. In addition, facilitated Respiratory Fit Testing for the University and community health providers. |
| 2019 | As an outcome of a focused employee safety initiative within the University of Virginia Health System, helped lead a 26% reduction in OSHA reportable sharps injuries, a 15% reduction in OSHA reportable trip/fall injuries, and a 34% reduction in OSHA reportable patient handling injuries over a two year period. |
| 2019 | Co-led the implementation of a University of Virginia Health System policy to improve employee immunity to measles and pertussis diseases. Improved immunity of more than 11,000 employees from a baseline of 70% to 99% over a six month period. Current effort focusing on improving immunity for a broader set of 7,000 University employees. |
| 2017 | Trained as a "Lean Practitioner" within the University of Virginia Health System to support the Lean Management initiative of the Health System. |
| 2016 | Assigned a lead role in overseeing employee safety within the University of Virginia Health System. Charged with reducing injuries by 15% in first year and OSHA-reportable injuries by 25% in the second year. Formalizing the process by which injuries and unsafe conditions are reported, root causes are analyzed, and interventions are implemented. Focusing on reducing injuries related to patient handling, sharps injuries, blood and body fluid exposures, and falls. |
| 2015 - 2017 | In collaboration with the University Physicians Group (UPG) and U.S Preventative Medicine, assisted in the development and implementation of an employee wellness program. Managed the development and implementation of a comprehensive biometric screening program that resulted in the screening of the majority of UPG employees. |
| 2011 - 2017 | In collaboration with the UVA Human Resources and Aetna, assisted in the development and implementation of a University-wide employee wellness program. Managed the development and implementation of a comprehensive biometric screening program that resulted in the screening of more than 3700 participants in the program's first year and more than 8000 in each subsequent year. |
| 2009 - 2021 | Responsible for the development and implementation of a physician occupational health surveillance program at UVA. Monitor the compliance of more than 900 licensed independent practitioners in their participation in annual surveillance to monitor 8 infectious disease elements. |
| 1995-2009 | Developed and implemented a rehabilitation engineering service contract with the Piedmont Regional Educational Program, a private non-profit corporation that provides assistive technology services to six school districts in Central Virginia. |

| | |
|---|---|
| 2006 | Consultant with the University of Virginia's Healthcare Product Evaluation Center to provide ergonomic analyses and recommendations pertaining to the design of a new generation of bedside patient chairs. This work was requested by an internationally renowned manufacturer of ergonomic office chairs. |
| 1999 - 2001 | Reviewer, RESNA 2001 Student Scientific Paper Competition. |
| 2000 | Registered Professional Engineer, having successfully passed, on first attempt, the Principles and Practices of Engineering exam. |
| 1998-99 | Developed a one-day educational course entitled "Practical Approaches to Seating and Positioning" for clinicians who provide services to individuals with disabilities. Delivered the training throughout the Mid-Atlantic States. |
| 1997 | Elected to the Professional Advisory Board of the Epilepsy Foundation of America. This represents the first time ever that an engineer has been elected to the Board. |
| 1997 | Co-authored a $50,000 contract from the Virginia Department of Rehabilitative Services to provide management and technical support of the Department's statewide rehabilitation engineering and assistive technology programs. |
| 1996 | Co-author of the University of Pittsburgh's grant-funded curriculum for the Assistive Technology Training Program for Rehabilitation Technology Suppliers. Lead author of the Engineering Principles and Biomechanics components of the curriculum. |
| 1996 | Co-author of CARTE, The Center for Assistive and Rehabilitation Technology Training and Evaluation, a one-year project funded by the Virginia Department of Rehabilitative Services to increase the availability of assistive technology evaluation services in Central Virginia. Served as Training Coordinator for the Center. Amount of award: $125,000. |
| 1996 | Collaborated in the design of an automatic braking system for manual wheelchairs. This design has been submitted to the University of Virginia Patent Foundation for potential commercialization. |
| 1996 | Designed the front-latch subasis bar hardware and small-diameter subasis bar. Collaborated with Metalcraft Industries, a manufacturer of assistive technologies, in the technology transfer process which resulted in the commercialization of these products. |
| 1995-1996 | Co-author of the RESNA document "Guidelines for Advanced Curriculum Development for Seating and Mobility Assistive Technology Practitioners". This work was supported by a grant from NIDRR. |
| 1995-1996 | As an activity of the Virginia Rehabilitation Technology Training Project, developed and delivered twenty high-level seminars focusing on the state-of-the-art in clinical and research practices within the rehabilitation technology arena. Areas of focus included: specialized seating and positioning; mobility; augmentative and alternative communication; technology for |

|  |  |
|---|---|
|  | personal vehicle transportation; robotics applications; assistive technology for older adults; computer applications and adaptations; human factors engineering; and, exemplary service models. Subject matter was delivered by nationally-recognized clinical and research leaders to an audiences made up of professionals from a variety of backgrounds. |
| 1994 | Author of the University of Virginia's proposal for its fourth Rehabilitation Long-Term Training Program in Rehabilitation Engineering/Technology. Proposal was funded in the fall of 1995. Served as Co-Project Director. Amount of award: $289,017. |
| 1994 | Assisted the Virginia Department of Rehabilitative Services in the development of a statewide counselor training program focusing on assistive and rehabilitation technology training. Training modules were developed for virtually every aspect of technology. Chosen as one of the trainers for delivering the module on Seating and Mobility. |
| 1993-1994 | Developed and managed a $70,000 contract with the Virginia Department of Rehabilitative Services to provide management support to the Department's rehabilitation engineering program. Developed a CQI Plan and a Technical Supervision Plan for the Department. |
| 1991-1994 | Reviewer of Scientific Papers submitted to RESNA for presentation at the 1992-1995 Annual RESNA Conferences and publication in the Conference Proceedings. |
| 1983-1996 | Trained and supervised 35 graduate biomedical and rehabilitation engineers enrolled in the University of Virginia's federally-funded Rehabilitation Engineering Training Program |
| 1989 | Co-authored the University of Virginia's proposal for its third Rehabilitation Long-Term Training Program in Rehabilitation Engineering. Proposal was funded in the fall of 1990. Served as clinical coordinator and educator for the project. Amount of award exceeded $300,000. |
| 1988 | Developed new strategies to improve the fit and function of the Contour U seating system manufactured by Pin Dot Products. Collaborated with the manufacturer to transfer these strategies to a commercial domain. These strategies continue to be used. |
| 1986-1988 | As an invited speaker, presented rehabilitation engineering services at the University of Virginia to United States congressional aides. |
| 1985-1991 | Professional staff member of the RSA-funded Rehabilitation Engineering Training Program and of the NIDRR-funded Rehabilitation Engineering Center on Seating and Wheelchair Design. |
| 1985 | Established the Commonwealth's first comprehensive wheelchair seating program. This program quickly earned a national reputation for its ability to successfully solve complex seating problems. |
| 1984 | Provided the technical lead in a three day study of the feasibility of rehabilitation engineering technologies applied in a total care facility at the Richfield Retirement Communities in Salem, Virginia. |

| | |
|---|---|
| 1984 | Awarded $15,000 contract from West Virginia's Department of Mental Health and Mental Retardation to introduce rehabilitation engineering technologies to the state and to assess all residents in the state's MHMR facilities who possess multiple disabilities. |
| 1984 | Authored a proposal to establish the nation's first mobile rehabilitation engineering laboratory. Received $50,000 grant from the Virginia Office of the Secretary of Human Resources for this project. Successfully developed the mobile laboratory that same year. |

**SELECT PRESENTATIONS**

| | |
|---|---|
| 2021 | "Legal and Safety Aspects of Transporting Passengers with Mobility Impairments in Motor Vehicles." Virginia Trial Lawyers Association Annual Retreat. Co-Presenter with Elizabeth Ufkes, Esq. |
| 2018 | "Influency of Respirator Change Following Annual Respirator Fit Testing at an Academic Medical Center." Poster Presentation, IDWeek 2018 Conference (Co-author) |
| 2018 | "Characterizing Flu Vaccine Exemption Behavior Among Healthcare Personnel: Pattern Recognition Algorithms in Employee Health Data." Poster Presentation, Society for Epidemiological Research 2018 Conference. (Co-author) |
| 2017 | "Characteristics of Health Care Workers That Decline Influenza Vaccination for Varying Reasons." Poster Presentation, IDWeek 2017 Conference. (Co-author) |
| 2006 | "Solving Difficult Seating Cases Associated with Neuromuscular Disease." 12th Annual Conference: Management Strategies For Motor Impairments In Children With Neuromuscular Conditions. Co-Presenter with Alan Donaldson, OTR/L, ATP |
| 2004 | "Complex Seating For the Involved Patient." Kluge Children's Rehabilitation Center Grand Rounds. Co-Presenter |
| 1995-1998 | "Introduction to Rehabilitation Engineering." A three-hour credit graduate biomedical engineering course taught at the University of Virginia. |
| 1996 | "Meeting the Seating Needs for Individuals with Spinal Cord Injury." Management of the Patient with Spinal Cord Injury, New Challenges - New Approaches to Recurring Problems in Spinal Cord Injury Care, The Ninth Annual Advanced Conference for Health Professionals, Williamsburg, Virginia. |
| 1996 | "Liability and Warranty - What are the Risks to the Users and Vendors." Tri-State Assistive Technology Conference, Alexandria, Virginia (co-presenter). |
| 1996 | "Developing a Model Community-Based Assistive Technology Evaluation Service Delivery System." Tri-State Assistive Technology Conference, Alexandria, Virginia (co-presenter). |
| 1996 | "Exemplary Service Models and Approaches." A two-day workshop focusing on model |

|      | |
|------|--|
|      | programs and approaches to delivering assistive technology services, Fishersville, Virginia (co-presenter). |
| 1995 | "Wheelchair Seating and Positioning: Improving your Services From Assessment through Follow Up." A two-day seminar focusing on state-of-the-art in clinical and research practices, delivered as an activity of the Virginia Rehabilitation Technology Training Project, Charlottesville, Virginia. |
| 1992 | "Fundamentals of Seating." A one-day workshop on seating principles and applications for physical and occupational therapists. |
| 1991 | "Funding and Reimbursement Issues for Assistive Technologies." 2nd Mid-Atlantic Regional Conference on Rehabilitation Engineering, Newark, Delaware. |
| 1990 | "Options in Custom Seating For Solving Difficult Seating Problems." 1st Mid-Atlantic Regional Conference on Rehabilitation Engineering, Charlottesville, Virginia. |
| 1989 | "Sit Right." A two-day workshop on seating principles and applications for Virginia's Department of Mental Health and Mental Retardation, Petersburg, Virginia. |
| 1988 | "Design for Success." A two-day workshop on effective design of assistive devices for Virginia's Department of Mental Health and Mental Retardation, Lynchburg, Virginia. |
| 1988 | "Custom Seating at the University of Virginia." American Academy of Orthotists and Prosthetists Continuing Education Conference on Spinal Orthotics and Seating, Kansas City, Missouri. |
| 1987 | "Custom Seating at the University of Virginia." American Academy of Orthotists and Prosthetists Continuing Education Conference on Upper Extremity Prosthetics and Orthotics, Alexandria, Virginia. |
| 1987 | "Options in Customized Seating For Severely-Involved Residents." A multiweek training symposium on the selection, fabrication, and fitting of customized seating for residents at Central Virginia Training Center, Lynchburg, Virginia. |
| 1987 | "Rehabilitation Engineering at the University of Virginia." Invited lecturer for the Department for the Visually Handicapped, Virginia Chapter Association For Education and Rehabilitation of the Blind and Visually Impaired, Charlottesville, Virginia. |
| 1986 | "Seating Fundamentals and Applications." A one-day workshop for the Richmond Pediatric Interest Group, Richmond, Virginia. |
| 1986 | "Customized Seating for Persons with Head Injuries, Principles and Applications." Virginia Commonwealth University, 10th Annual Postgraduate Course on Rehabilitation of the Brain-Injured Adult and Child, Williamsburg, Virginia. |
| 1985 | "Rehabilitation Engineering at WWRC." Virginia Rehabilitation Association, Annual |

|      |                                                                                                                                                                                                  |
|------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|      | Conference on Rehabilitation, Williamsburg, Virginia.                                                                                                                                            |
| 1984 | "Rehabilitation Engineering at WWRC." Virginia Rehabilitation Association, Annual Conference on Rehabilitation, Virginia Beach, Virginia.                                                        |
| 1984 | "Rehabilitation Engineering at WWRC." National Rehabilitation Association, Annual Conference on Rehabilitation, Atlanta, Georgia.                                                                |
| 1984 | "Worksite Modification for Effective Job Placement." West Virginia Department of Vocational Rehabilitation, Conference on Employment of Persons With Disabilities, Charleston, West Virginia.    |
| 1983 | "Rehabilitation Engineering Applications for Persons with Cerebral Palsy." United Cerebral Palsy Association, Maryland District, Conference on Rehabilitation Technologies, Bowie, Maryland.    |

## PUBLICATIONS

| | |
|------|---|
| 2022 | Eby, JC, et al. Influence of critically appraising exemption requests from healthcare personnel along a spectrum of influenza vaccine hesitancy. Infection Control & Hospital Epidemiology, 1-7. doi:10.1017/ice.2021.513 |
| 2007 | Farrell WJ, et al. Comparison of Pressure-Relieving Characteristics of Mattress Overlays and Head Supports Used In Pediatric Intensive Care Settings. Proceedings of the WOW 2007 National Conference on Advanced Care. |
| 2000 | Schuch J, Donaldson A, and Baumgartner P. Carving a Niche. Rehab Management. 2000; 13(6):84-90. |
| 1996 | Schuch J, Breeden B. Managing the Legal Liabilities and Risks Inherent in the Delivery of Assistive and Rehabilitation Technology Services and Devices. Proceedings of the RESNA 1996 Annual Conference. 1996;16:26-28. |
| 1996 | Schuch J. "Quality Assessment and Improvement Within the University of Virginia's Rehabilitation Engineering Service Program." Technology and Disability. 1996; 5:25-33. |
| 1995 | Schuch J, Pelegano JP. Development of a Bed Overlay to Control Extensor Tone, Improve Respiration, and Reduce Mattress Interface Pressures. Proceedings of the RESNA 1995 Annual Conference. 1995; 5:5-7. |
| 1995 | Hughlett NS, Schuch J. Development of a Car Safety Restraining for Children who Escape Commercial Systems. Proceedings of the RESNA 1995 Annual Conference. 1995;15:11-13. |
| 1994 | Schuch J, Margolis SA.. Modifying the Subasis Bar to Enhance its Performance. Proceedings of the RESNA 1994 Annual Conference. 1994;14:284-286. |
| 1994 | Hughlett NS, et al. Modifying Commercially-Available Walkers to Meet Individual Needs. |

Proceedings of the RESNA 1994 Annual Conference. 1994;14:28-31.

1993 — Sprigle S, Schuch J. Using Seat Contour Measurements During Seating Evaluations of Individuals with SCI. Assistive Technology. 1993;5(1):24-35.

1992 — Smith J, et al. Prosthetic Management of Hemicorporectomy Patients: New Approaches. Archives of Physical Medicine and Rehabilitation. 1992;73(5):493-497.

1990 — Schuch J, Sprigle S. Using Seat Contour Measurements as an Evaluation and Prescription Tool for Seating SCI Persons. Proceedings of the Sixth International Seating Symposium. 1990;6: 24-28.

1989 — Cross L, et al. Multidisciplinary Approach to the Rehabilitation of a Hemicorporectomy Patient. Proceedings of the Fifteenth Annual Meeting and Scientific Symposium of the American Academy of Orthotists and Prosthetists.

1988 — Schuch J. Flexible Joint Pipe: An Orthotic/Prosthetic Tool. Proceedings of the Third International Conference on Rehabilitation Technology. 1988;3:110-111.

1986 — Hope RC, et al. Multidisciplinary Approach To Rehabilitation. Thirteenth Institute on Rehabilitation Issues.

1985 — Law D, Schuch, J. The Nation's First Mobile Rehabilitation Engineering Unit. Proceedings of the Eighth Annual Conference on Rehabilitation Technology. 1985;5:189-193.

1985 — English J, Knorr K, and Schuch J. Rehabilitation Engineering Technology Applied in a Total Care Facility: A Feasibility Study. Proceedings of the Eighth Annual Conference on Rehabilitation Technology. 1985;5:148-151.

1984 — Schuch J, and Law D. REACH: An Innovative Approach To Service Delivery for Rural Rehabilitation. Proceedings of the First International Conference of Rural Rehabilitation Technologies. 1984;1:136-142.

Testimonial History of Jonathon Z. Schuch, M.Eng., P.E.
Past Four Years

| DATE | CASE | RETAINED BY | DEPOSED? | TRIAL? |
|---|---|---|---|---|
| 2018 | Lynn Gray, et al versus AM-VAN, Inc., et al (Circuit Court, Charles County, MD) | Plaintiff | Yes | No, case settled |
| 2018 | McLaughlin versus DriveTime Car Sales Company, LLC, et al (Las Vegas, NV) | Plaintiff | Yes | No, case settled |
| 2018 | Mansfield versus Bruno Independent Living Aids, et al (Charleston, WV) | Plaintiff | Yes | No – case resolved via mediation |
| 2018 | McKinnon versus Able Care Health Equipment, et al (Gentry County, MO) | Plaintiff | Yes | No, case settled |
| 2018 | Black versus Pride Mobility Products, et al. (Seattle, WA) | Plaintiff | Yes | No, case settled |
| 2018 | Hughes versus Invacare Corp. and Advanced Home Care, Inc. (Buncombe County, NC) | Plaintiff | Yes | |
| 2020 | Patti versus Action Manufacturing, Inc., et al. (Camden County, NJ) | Plaintiff | Yes | No - case resolved via mediation |
| 2020 | Sweeney versus Baycare Health System, Inc., et al. (Pinellas County, FL) | Defendant | Yes | |
| 2020 | Esser versus Permobil, Inc. et al. (Jefferson County, KY) | Defendant | Yes | No – case settled |
| 2020 | Telfair, et al. -v- MBI Logistics, LLC (Washington, DC) | Plaintiff | Yes | |
| 2021 | Winborn, et al. v South Central Tennessee Development District (Giles County, TN) | Plaintiff | Yes – video deposition | Video deposition used at trial – judgement for the plaintiff |
| 2021 | Dade-McCraw v Brinton Woods of Washington DC, et al. (Superior Court of DC) | Plaintiff | Yes | |
| 2021 | Zuzel v SEPTA, et al. (U.S. District Court, Eastern District of PA) | Plaintiff | Yes | SEPTA settled prior to trial. |
| 2022 | Wright v Your Choice Senior Care, et al. (Circuit Court of Mobile County, Alabama) | Plaintiff | Yes | |
| 2022 | Cunningham v Potomac Valley Transit Authority, et al. (Mineral County, WV) | Plaintiff | Yes | |

## *JZS Consulting, LLC*

849 Locust Avenue  
Charlottesville, Virginia 22902  
434-989-2065

Engineering Consultation, Investigation, and Analysis

## Fee Schedule

| Description | Rate |
|---|---|
| Consulting and/or expert witness services including (but is not limited to) research, conferences, consultations with client, reviewing documents, organizing documents, analysis, testing, responding to discovery requests, report writing, testifying, investigating, reading and signing deposition transcripts, portal-to-portal travel, waiting time, preparing exhibits, preparing demonstrative aids, and preparation time for testifying at deposition, trial, hearing, arbitration or other venues. | $350 per hour |
| Expenses including (but not limited to) travel, testing, research, printing, copying, document purchase, storage of evidence or documents, etc. | Billed at cost |

*JZS Consulting, LLC*

---

849 Locust Avenue
Charlottesville, Virginia 22902
434-989-2065

Engineering Consultation, Investigation, and Analysis

# Expert Witness Retention Contract

1. **Parties.** This contract is made between JZS Consulting, LLC ("LLC") and The Forsberg Law Firm, PC ("Client") for expert witness services provided by Jonathon Z. Schuch, P.E. ("Expert") in the underlying legal matter involving ABM Aviation, Inc.

2. **Retention.** The parties agree that Expert will only become retained by Client once this contract has been mutually executed and Client has paid the initial retainer specified in paragraph 4.b. Neither Expert nor LLC have any duties to Client until such time. To be valid, this contract must be executed (and the initial retainer received) within 30 days of Expert signature date.

3. **Expert's Fees and Expenses.** The parties agree that the fee for all time Expert spends on the case will be compensated at a rate of $350/hour. It is agreed that this specifically includes (but is not limited to) research, conferences, consultations with Client, reviewing documents, organizing documents, analysis, testing, responding to discovery requests, report writing, testifying, investigating, reading and signing deposition transcripts, portal-to-portal travel, waiting time, preparing exhibits, preparing demonstrative aids, and preparation time for testifying at deposition, trial, hearing, arbitration or other venues. The hourly rate will be capped at 16 hours maximum per day for work conducted outside of Charlottesville, Virginia. In any and all events, Client will be responsible for all reasonable out of pocket expenses including, but not limited to, travel, testing, research, copying, storage of evidence or documents, etc.

4. **Payment Terms.**

    a. All payments are to be made to:   JZS Consulting, LLC
    849 Locust Avenue
    Charlottesville, Virginia 22902

    LLC's Taxpayer ID# (if applicable) is: 86-2648683

    b. The retainer amount is $5000. Upon request, LLC will provide Client with an itemized statement that details Expert's time and expenditures. In the absence of such a request, LLC will provide Client with an itemized statement if the retainer is depleted. LLC will also include an invoice for an additional retainer which shall be due and payable upon

receipt. With the exception 5.c. and 5.d., any portion of any retainer not spent will be returned within 30 days.

c. All invoices will be due upon receipt and must be paid within 30 days.

d. Overdue invoices will accrue interest at a rate of 1.5% per month.

e. Fees for any time Expert is asked to reserve for testifying (at trial, hearing, deposition, arbitration or other venue, which also includes travel) and preparation for said testimony must be paid in advance, and in full, 10 (ten) business days prior to the time reserved for the scheduled testimony. Expert is under no contractual obligation to reserve the time or appear to testify and provide opinions unless LLC has received this payment in full at least 10 (ten) business days prior to the time reserved for the scheduled testimony.

f. Client is responsible for collecting any and all deposition fees owed by other lawyers or parties. In the event Expert's deposition fees are reduced by court order, Client shall still pay LLC Expert's full fee specified in paragraph 3.

g. If a retainer is depleted and a balance is due, LLC will invoice Client upon completion of Expert's report(s). All fees must be paid in full before a report is released to Client, other parties or anyone else. Expert is under no duty to release a report until LLC has been paid in full for all work performed to date.

h. If a retainer is depleted and a balance is due, LLC will invoice Client before scheduled testimony for any outstanding fees and expenses for work performed to date. All such fees must be paid in full before Expert testifies. Expert is under no contractual duty to appear to testify and provide opinions until LLC has been paid in full for all outstanding services performed and expenses incurred on behalf of Client.

5. **Fees for Late Notice Cancellation or Rescheduling of Testimony.**

   a. Client understands that LLC will suffer damages from late notice cancellation or rescheduling of Expert's testimony and that since the precise amount of these damages would be difficult to determine, LLC shall instead be entitled to the cancellation and rescheduling fees specified in paragraphs 5.c and 5.d.

   b. The fees specified in paragraph 4.e. are 100% refundable to Client in the event Expert's scheduled testimony is cancelled or rescheduled with notice to Expert of 3 (three) or more business (Monday - Friday) days.

    c. In the event Expert's scheduled testimony is cancelled or rescheduled with 1 (one) or 2 (two) business days' notice, LLC may retain a cancellation fee of 10% the amount from paragraph 4. e. The remaining amount will at Client's option be applied to future testimony or refunded to Client.

    d. In the event of same day cancellation or rescheduling of Expert's Testimony, or if Expert's testimony is completed in less time than was reserved pursuant to paragraph 4. e., LLC may retain 100% of the amount specified in paragraph 4.e.

    e. In the event of any cancellation or rescheduling of testimony, Client shall be responsible for all non-refundable out of pocket travel expenses incurred by Expert, such as airline tickets and hotel rooms.

6. **Duties of Client.** The Client's duties specifically include, but are not limited to:

    a. Abiding by the applicable rules of professional conduct for attorneys.

    b. Making <u>all</u> payments as specified in Paragraphs 4 and 5 under the terms as specified in Paragraphs 4 and 5.

    c. Providing Expert with copies of or access to <u>all</u> non-privileged, arguably relevant documents, evidence, and other materials in the underlying legal matter.

    d. Notifying Expert of all parties and attorneys in the case, so that Expert can check for conflicts of interest.

    e. Where circumstances reasonably allow, providing Expert with prompt notice of any *Daubert* motions, *Frye* motions, motions in limine, or other pre-trial motions made by other parties or persons to restrict, exclude, or in any way limit Expert's testimony or Expert's participation in the underlying legal matter.

    f. Obtaining Expert's advance approval (for accuracy) of the relevant portions of any and all answers to interrogatories, motions, expert designations, or other documents which summarize Expert's qualifications, methodology, opinion(s), and/or anticipated testimony.

    g. Being available, as reasonably requested, to meet with Expert prior to anticipated testimony.

    h. Promptly notifying Expert of when and where Expert may be requested to appear to testify.

    i. Promptly notifying Expert of any issues related to paragraph 8.b. to which Client is or becomes aware of.

j. Promptly notifying Expert of the settlement or final adjudication of the underlying legal matter.

7. **Duties of Expert.** The Expert's duties are:

   a. To truthfully represent Expert's credentials.

   b. To formulate with honesty and due care, and truthfully express, Expert's opinion(s) in those areas (and only those areas) where Expert feels qualified to render an opinion and where Client has requested an opinion. Client agrees that Expert's opinion(s) are not preordained, might be contrary to Client's position, and are subject to modification as a result of new or additional information.

   c. To cease work on the underlying legal matter and promptly inform Client whenever LLC has accrued unpaid fees and expenses totaling more than $700. In this event, Expert shall not perform further work on the underlying legal matter until approval is given by Client and payment is received.

   d. Expert is under no duty to provide and express opinions if Expert is given time deadlines or cost-based or other restrictions by Client that would not reasonably allow Expert to in good faith formulate and express his opinions with reasonable care.

   e. Subject to paragraph 7.d., to prepare a written report if Client requests one.

   f. Subject to paragraph 7.d. and to circumstances beyond the Expert's control, to meet all reasonable deadlines requested by Client.

   g. To retain and preserve (during this engagement) all evidence provided to Expert from the underlying legal matter, unless Client gives written permission for destructive testing or the like.

   h. To be available on reasonable notice to testify.

   i. To be available on reasonable notice to consult with Client. Expert's cellular number is 434-989-2065.

   j. To work exclusively with Client in the underlying legal matter, unless the parties mutually agree in writing otherwise.

   k. Upon receipt from Client of the list of attorneys and parties specified in paragraph 6.d., to within 30 days check for conflicts of interest with due care and, within the same 30 day period, to notify Client of any conflicts of interest discovered that preclude Expert's further involvement in the underlying legal matter.

8. **Expert's Right of Withdrawal From Case.** Expert shall have the absolute right to withdraw, without any liability, from the case if Client violates any of the duties specified in paragraph 6 above or if:

    a. Expert discovers a conflict of interest which precludes Expert's further involvement in the underlying legal matter.

    b. Expert discovers that because of legal restrictions Expert's involvement or testimony in the case could reasonably be deemed to be practicing Expert's profession without a license.

9. **Withdrawal.** Notice of withdrawal under Paragraph 8 shall be in writing from Expert on behalf of the LLC to Client. In the event of withdrawal, the parties agree that Client remains fully liable for all accrued but unpaid fees, expenses, and interest.

10. **Termination.** This contract shall be terminated upon written notice to Expert from Client at any time, by Expert's withdrawal pursuant to paragraph 8, at such time as Client is no longer involved in the underlying legal matter, or upon the settlement or final adjudication of the underlying legal matter. In the event of termination Client is still responsible for all sums owed LLC.

11. **Document/Evidence Retention.** Expert shall have no duty to retain any documents, reports, evidence, transcripts, exhibits, e-mails, electronic files or other materials from the underlying legal matter for more than 30 (thirty) days following the termination of this agreement. Expert shall return (at Client's expense) all records and evidence in the underlying legal matter to Client if a written request to do so is received by Expert within the 30 (thirty) days following the termination of this agreement.

12. **Disputes.** Any controversy, claim, or dispute arising out of or relating to this Contract, shall be resolved through binding arbitration conducted in accordance with the rules of the American Arbitration Association in the State in which the LLC is registered. The law of the State in which the LLC is registered will be the governing law. The arbitration award will be enforceable in any state or federal court. In any arbitration or court proceeding, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs. In addition, Client shall be responsible for payment of attorneys' fees and expenses associated with the LLC's efforts to collect monies owed under the terms of this Contract.

13. **Miscellaneous.** Each party agrees that it may not assign its interest, rights or duties under this Contract to any other person or entity without the other party's prior approval. (Expert is under

Case 4:20-cv-03430   Document 51-2   Filed on 06/03/22 in TXSD   Page 17 of 17

no duty to work for successor law firms on the underlying legal matter.) The performance of this contract by either party is subject to acts of God, death, disability, government authority, disaster or other emergencies, any of which make it illegal or impossible to carry out the agreement.  It is provided that this contract may be terminated for any one or more of such reasons by written notice from one party to the other without liability.  If either party agrees to waive its right to enforce any term of this contract, it does not waive its right to enforce any other terms of this contract.  This written contract represents the entire understanding between the LLC and Client.  The individual signing this contract on behalf of Client represents and warrants that he/she is duly authorized to bind Client.

14. Possibility of travel restrictions due to a family-member's medical condition.  A member of Jonathon Z. Schuch's immediate family has a medical condition that will require multiple surgeries and six or more months of treatment and recovery at some point in the future.  During that period, Mr. Schuch will not be able to travel to participate in any inspection, deposition, or trial outside Charlottesville, Virginia.  Mr. Schuch will be able to participate and/or testify by Zoom or other remote means.

EXPERT, by

*JZS Consulting, LLC*
*by Jonathon Z. Schuch*

_____
Signature

Jonathon Z. Schuch, P.E., Member,
JZS Consulting, LLC

Date: May 5, 2022

CLIENT, by

_____
Signature

_____
Print Name

Date:_____

Page 6
Retention Agreement: JZS Consulting, LLC